**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

COMMODITY FUTURES
TRADING COMMISSION

                Plaintiff,

v.

ANDRE FLOTRON,

                Defendant,

**Civil Action No. 18-158**

**ECF Case**

**JURY TRIAL DEMANDED**

## COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

Plaintiff Commodity Futures Trading Commission ("CFTC") alleges as follows:

### I.  SUMMARY

1.      Beginning in at least August 2008 through at least November 2013 (the "Relevant Period"), Defendant Andre Flotron ("Flotron") engaged in a manipulative and deceptive scheme in the precious metals futures markets on a registered entity.  As part of this scheme, Flotron engaged in manipulative or deceptive acts and practices by "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution) on an ongoing basis.  On numerous occasions, Flotron placed a visibly small order for COMEX gold or silver futures contracts that he wanted to get filled (the "Genuine Order") and entered a larger order for the same contract on the opposite side of the book that he intended to cancel before execution (the "Spoof Order").  In placing these Spoof Orders, Flotron intentionally sent false signals of increased demand or increased supply designed to trick other market participants into executing against his Genuine

Orders, or Flotron recklessly disregarded that the Spoof Orders would send such false signals to market participants.

2.     By virtue of this conduct, as further alleged herein, from approximately July 2011 through at least November 2013, Flotron's trading practices described above violated Section 4c(a)(5)(C) of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 6c(a)(5)(C) (2012).

3.     By virtue of this conduct, as further alleged herein, from approximately August 2011 through at least November 2013, Flotron engaged in acts and practices that violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Commission Regulation ("Regulation") 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017).

4.     Plaintiff brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), to enjoin Flotron's violative acts and practices and to compel Flotron's compliance with the Act.  In addition, Plaintiff seeks civil monetary penalties and such other equitable relief, including but not limited to disgorgement, as this Court deems necessary and appropriate.

## II.  JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012), which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress.  Section 6c(a) of the Act,  7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

6.     Venue properly lies with this Court, pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Flotron is found in this District or transacted business in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c)(3).

## III.  PARTIES

7.     **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and Regulations promulgated thereunder.

8.     **Defendant Andre Flotron** was employed by Bank A as a trader from at least 2008 to January 2014.  For the duration of this time period, Flotron was employed as a trader and in a managerial capacity, overseeing other precious metals traders at Bank A, including but not limited to those based in Bank A's Stamford, Connecticut offices.  Flotron has never been registered with the Commission.  Flotron is a Swiss national domiciled in Switzerland.  He is currently, however, in the United States and must remain here pending trial pursuant to this Court's order in United States v. Flotron, 17-cr-00220.

## IV. FACTS

### A.  Market Fundamentals

9.     A **Futures Contract** is an agreement to purchase or sell a commodity for delivery or cash settlement in the future at a specified price.  A futures contract traded on an exchange has standard, non-negotiable contract specifications.

10.    An "**Order**," in the context of electronic exchange trading, is a request submitted to an exchange to buy (that is, "bid") or sell (that is, "offer") a certain number of a specified futures contract.  An order is for one or more contracts.  Contracts may also be called "lots," among other things.  Orders are entered into the exchange's Order Book.  When one or more contracts in an order are bought or sold, that is a "fill" (or a "trade" or "execution").  At any time

3

before the order is fully filled, the trader can "cancel" the order.  When an order is canceled, the contracts that have not yet been bought or sold are pulled from the Order Book.

11.     When a "buy" or "sell" order is submitted to an exchange's electronic trading system, the order becomes part of the **Order Book**.  In the Order Book, each trader can view the aggregate number of contracts that all traders are actively bidding or offering at a given price level.  The best-bid level, or first-bid level, is the highest price at which someone is willing to buy. The best-offer level, or first-offer level, is the lowest price at which someone is willing to sell.  The bid-ask spread is the difference between those two prices.

12.     Traders can view the aggregate resting contracts and orders up to the tenth-bid and tenth-offer levels.  This combined bid and offer information is often referred to as the visible Order Book and represents the visible market depth.  Traders often rely on information in the Order Book to make trading decisions.

13.     **Order Book Balance** refers to the numeric relationship between the number of pending visible contracts offered and the number of pending visible contracts bid.  Many market participants rely on the information contained in the Order Book and consider it when making trading decisions.  For instance, if the aggregate size and number of sell orders significantly outweighs the total aggregate size and number of buy orders, market participants may believe that the Order Book Balance indicates that supply is exceeding demand and a price drop is imminent.  Accordingly, they may decide to place orders to sell.

14.     **Commodity Exchange, Inc. ("COMEX")** is a futures exchange located in New York, New York.  COMEX is a designated contract market for trading futures and options under the Act.  COMEX is owned and operated by CME Group, Inc. ("CME Group"), which is a

Delaware corporation with its headquarters in Chicago, Illinois.  CME Group's COMEX lists for trading gold futures, silver futures, and other precious metals contracts.

15.    **COMEX Gold Contract** is regularly traded on Globex (CME's electronic trading system) for delivery during the current calendar month, the next two calendar months, any February, April, August, and October falling within a 23-month period, and any June and December falling within a 72-month period beginning with the current month.  One contract unit is equal to 100 troy ounces.  The COMEX Gold Contract is generally referred to herein as "Gold Futures."

16.    **COMEX Silver Contract** is regularly traded for delivery during the current calendar month, the next two calendar months, any January, March, May, and September falling within a 23-month period, and any July and December falling within a 60-month period beginning with the current month.  One contract unit is equal to 5,000 troy ounces.  The COMEX Silver Contract is generally referred to herein as "Silver Futures."

17.    **Tick** refers to the minimum price fluctuation for a particular futures contract.  The minimum price fluctuation for Gold Futures is $.10 per troy ounce.  The minimum price fluctuation for Silver Futures is $.005 per troy ounce.

18.    Globex's matching algorithm applies a First-In-First-Out ("FIFO") principle to orders at the same level of the Order Book.  For example, if there are multiple orders sitting at the level of the best bid, and an offer is then placed at that same level, the bids will be filled in the order that they were placed.  Modifications to price or quantity will move the order to the back of the queue.

**B.** **Flotron's Manipulative and Deceptive Scheme**

19.     During the Relevant Period, Flotron engaged in an ongoing practice of spoofing. Flotron entered comparatively large orders for precious metals futures contracts, which he intended to cancel before execution (Spoof Orders), opposite smaller orders for precious metals futures contracts, which he desired to execute (Genuine Orders). Flotron entered the Spoof Orders with the intent to send false signals to market participants about the balance of the Order Book and trick market participants into transacting on his Genuine Orders, or, at the very least, with reckless disregard for the fact that his Spoof Orders would send such false signals to market participants.

20.     For example, from time to time, Flotron would enter a Genuine Order for less than 10 lots and, usually within 30 seconds thereafter, place a Spoof Order of 20 or more lots on the other side of the Order Book. More specifically, Flotron often placed the larger, Spoof Orders in an amount where the digits were the same (e.g., 22 lots, 33 lots, 44 lots, 55 lots, 99 lots, 111 lots). Typically, Flotron's Spoof Orders were placed at least one tick behind the best price so as to reduce the likelihood of them being filled.

21.     At times, in the event Flotron's initial Genuine Order was filled, he would then place a series of additional small Genuine Orders while the Spoof Order was still pending. These additional Genuine Orders tended to be at the same price as the initial Genuine Order. Moreover, the additional small Genuine Orders were, at times, placed in rapid succession, indicating that Flotron sometimes used an automated tool that conditioned the placement of an additional order on a prior one being filled.

22.     Upon placement of a Spoof Order, Flotron intended to cancel it before execution. The cancellation usually occurred after his Genuine Order or series of Genuine Orders was filled.

6

23.     When his Genuine Order was a buy order, Flotron's Spoof Order was an offer to sell.  In placing these Spoof Orders to sell, Flotron intended to send market participants a false signal of greater supply to create the impression that the price would likely decline and trick market participants into transacting on his Genuine Order to buy, or acted with reckless disregard that the Spoof Orders would send such false signals to market participants.

24.     When Flotron's Genuine Order was an offer to sell, Flotron's Spoof Order was a buy order.  In placing these Spoof Orders to buy, Flotron intended to send market participants a false signal of greater demand to create the impression that the price would likely rise and trick market participants into transacting on his Genuine Order to sell, or acted with reckless disregard that the Spoof Orders would send such false signals to market participants.

25.     In placing the Spoof Orders, Flotron gave market participants the false impression that he actually wanted to buy or sell the number of contracts in the orders when, in reality, he did not.

26.     Flotron engaged in the manipulative and deceptive scheme by spoofing to trick other market participants into executing against his Genuine Orders—to cause his Genuine Orders to be filled sooner, at a better price, or in larger quantities than they otherwise would.

27.     Flotron knew or recklessly disregarded that the Spoof Orders would create a false impression of Order Book Balance and result in misinformation, thereby luring market participants to trade based on Flotron's spoofing.  The risk that the Spoof Orders could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by Flotron's Spoof Orders was so obvious that Flotron must have been aware of it.  He knew that his Spoof Orders would appear in the Order Book and that traders often considered Order Book Balance information in making trading decisions.

7

Thus, Flotron was, at least, reckless with respect to the danger that his Spoof Orders would mislead other market participants.

**C. Flotron Spoofed and Taught a Subordinate How To Spoof**

28.     In or about July 2008, Trader A began working on Bank A's precious metals trading desk in Stamford, Connecticut.  For approximately Trader A's first two months on the desk in Stamford, Flotron was the primary person assigned to train Trader A.  Trader A sat next to Flotron in Bank A's Stamford office and observed Flotron's trading practices.

29.     During Trader A's training, Flotron gave Trader A instructions on how to spoof and demonstrated spoofing for Trader A's benefit.  Specifically, Flotron explained that Trader A should place an order Trader A wanted filled and that such an order should be broken up, or "iceberged," such that only a small piece of it was visible to the market at a time.  Flotron further explained that Trader A should then place a large, fully visible, "spoof" order on the opposite side of the market in an effort to trick market participants (including algorithmic traders) into transacting on his Genuine Order.  Trader A learned from Flotron to cancel the "spoof" order after the Genuine Order was hit (or lifted), so that the Spoof Order would not get filled.

30.     During the period in which he was training Trader A in Stamford, Flotron spoofed.  For example, on August 29, 2008, at 13:10:15.536,[1] Flotron placed a 7-lot Genuine Order to buy December-delivery Gold Futures at $836.40.  The 7-lot Genuine Order remained pending for approximately ten seconds, at which point Flotron placed a 44-lot Spoof Order to sell at $836.80 that he intended to cancel before execution.  Less than two-tenths of a second after Flotron placed the 44-lot Spoof Order, the 7-lot Genuine Order was filled in its entirety.  Flotron then placed a series of three additional 7-lot Genuine Orders to buy and then one 5-lot

---

[1]      All times referred to herein are Eastern Time.

Genuine Order to buy that were all filled over the next two seconds at either $836.40 or $836.30. Approximately two seconds after the 5-lot buy order was filled, Flotron cancelled the 44-lot Spoof Order to sell in its entirety.

31.     While on Bank A's precious metals desk in Stamford, and in accordance with the training he received from Flotron, Trader A spoofed.  For example, on October 9, 2008, at 8:42:49.115, Trader A placed a 3-lot order to sell December-delivery Gold Futures at $889.50. This 3-lot Genuine Order remained pending for over six minutes without getting filled.  At 8:49:18.528, Trader A entered a 40-lot Spoof Order to buy December-delivery Gold Futures at $888.50 that he intended to cancel before execution.  At 8:49:49.258, Trader A's 3-lot order to sell was still pending, so he placed another Spoof Order to buy—this time of 20 lots—at $889.00, five ticks higher than his original Spoof Order to buy.  Less than three seconds later, Trader A's 3-lot Genuine Order to sell began to be filled.  Trader A then placed a series of other small sell orders at $889.50 that were also filled over the next several seconds.  At 8:50:16.626, Trader A cancelled his 20-lot Spoof Order in its entirety.  At 8:52:02.264, after he placed and was filled on a series of even more small sell orders at $889.50, Trader A also cancelled his 40-lot Spoof Order in its entirety.

**D.  Examples of Flotron's Scheme Continuing Through 2013**

32.     Flotron continued to engage in a regular practice of spoofing in the manner described above through 2013, including but not limited to the following occasions.  With each Spoof Order he placed, Flotron intended to, or acted with reckless disregard that it would, send a false signal of increased supply or a false signal of increased demand to market participants. Flotron placed each Spoof Order with the intent to, or with reckless disregard that it would, trick market participants into transacting on his Genuine Order(s) and cause his Genuine Orders to be

filled sooner, at a better price, or in larger quantities that they otherwise would.  His pattern, as evidenced below, of placing Spoof Orders that were always canceled after his Genuine Orders were filled demonstrates that he always intended to cancel those Spoof Orders prior to execution.

### 1.  September 6, 2011 Spoofing

33.     On September 6, 2011, at approximately 5:06:32.3, Flotron placed a 1-lot Genuine Order to buy December-delivery Gold Futures at $1893.70 and a 1-lot Genuine Order to buy the same contract at $1893.60.  The 1-lot bid at $1893.70 was the best bid at the time of placement.

34.     Approximately two and a half seconds later, at 5:06:35.057, Flotron placed a 33-lot Spoof Order to sell at $1894.30 that he intended to cancel before execution.  His 33-lot order to sell was three ticks away from the best offer at the time of placement.

35.     Both of Flotron's 1-lot buy orders were filled less than one tenth of a second thereafter.

36.     Over the next six seconds, Flotron (either manually or through an automated trading tool he controlled) placed a series of fourteen additional 1-lot Genuine Orders to buy that were filled at either $1893.60 or $1893.70.

37.     At 5:06:43.251, Flotron cancelled his 33-lot Spoof Order to sell in its entirety.

### 2.  June 28, 2012 Spoofing

38.     On June 28, 2012, at 13:26:33.786, Flotron placed a 1-lot Genuine Order to buy August-delivery Gold Futures at $1550.10.  At the time, $1550.10 was the best bid in the market.  The price, however, moved away from Flotron's bid over the next eight seconds, trading as high as $1550.40.

39.     At 13:26:39.028, Flotron placed another 1-lot Genuine Order to buy August-delivery Gold Futures at $1550.20.

40.     At 13:26:42.415, with both genuine buy orders still pending, Flotron placed a 55-lot Spoof Order to sell August-delivery Gold Futures at $1550.50 that he intended to cancel before execution.

41.     Flotron's 55-lot sell order was two ticks away from the best offer at the time it was placed.

42.     Flotron's 1-lot buy order at $1550.20 was filled less than one-hundredth of a second after the placement of the Spoof Order.  And his initial 1-lot buy order at $1550.10 was filled approximately one second later.

43.     At 13:26:53.313, approximately three seconds after the last in a series of additional small genuine buy orders was filled, Flotron cancelled his 55-lot Spoof Order to sell in its entirety.

### 3.   February 15, 2013 Spoofing

44.     On February 15, 2013, at 5:59:28.544, Flotron placed a 1-lot Genuine Order to buy March-delivery Silver Futures at $30.180.  At the time of placement, this Genuine Order was at the best price level, but not the first in the queue.

45.     The Genuine Order sat pending for over four seconds, at which point Flotron placed a 55-lot Spoof Order to sell March-delivery Silver Futures at $30.190 that he intended to cancel before execution.

46.     At the time of placement, the Spoof Order to sell was one tick away from the best offer.

11

47.     At the time Flotron placed the 55-lot Spoof Order, the total visible sell-side order volume was 116 lots.  His Spoof Order, therefore, increased the visible sell-side volume by almost 50%.

48.     Less than one-tenth of a second later, Flotron's Genuine Order was filled.

49.     Less than four-tenths of a second after this fill, Flotron (either manually or through an automated trading tool he controlled) placed a series of four additional 1-lot Genuine Orders at $30.180 that were filled in quick succession (within 1.5 seconds).

50.     Flotron cancelled the 55-lot Spoof Order to sell less than two seconds after the fourth additional 1-lot Genuine Order was filled.

### 4. July 1, 2013 Spoofing

51.     On July 1, 2013, at 10:11:06.151, Flotron placed at 1-lot Genuine Order to sell August-delivery Gold Futures at a price of $1238.50.  At the time of placement, the order was two ticks away from the best offer in the Order Book (and there were seven lots better offered). Over the next seventeen seconds, several lots traded but none at a price higher than $1238.30.

52.     At 10:11:23.173, with his 1-lot sell order still pending at $1238.50, Flotron placed a 111-lot Spoof Order to buy August-delivery Gold Futures at $1237.90 that he intended to cancel before execution.

53.     At the time he placed this 111-lot Spoof Order to buy, it was three ticks below the best bid.

54.     At the time Flotron placed the 111-lot Spoof Order to buy, the visible volume on the offer side of the Order Book was 127 lots and the visible volume on the buy side of the Order Book was 119 lots.  Therefore, Flotron's 111-lot Spoof Order converted an Order Book that had

been relatively balanced into one in which there was almost twice as much volume bid as there was offered.

55.     Within 1.2 seconds of the placement of the 111-lot Spoof Order to buy, the market moved two ticks up, filling Flotron's 1-lot sell order at $1238.50 and a subsequent 1-lot sell order at $1238.60.

56.     Over the next 29 seconds, the market fluctuated between $1238.80 and $1238.30; Flotron's 111-lot Spoof Order to buy was at least four ticks away from the last trade.

57.     At 10:11:53.227, the price dropped to $1238.20 and at 10:11:54.543 it dropped to $1238.10, only two ticks away from Flotron's 111-lot Spoof Order.

58.     Less than one second after the price dropped to $1238.10 and approached his 111-lot Spoof Order, Flotron cancelled his 111-lot Spoof Order in its entirety.

59.     Within one-hundredth of a second of Flotron cancelling his 111-lot Spoof Order to buy, the market traded at $1237.90—the price at which his 111-lot Spoof Order had been.

60.     In short, Flotron never intended for the 111-lot order to be executed; he cancelled it as it became likely that it—or some portion of it—would get filled.

### 5.  *October 14, 2013 Spoofing*

61.     On October 14, 2013, at 8:26:47.706, Flotron entered a 5-lot Genuine Order to buy December-delivery Gold Futures contracts at a price of $1284.80.  At the time of placement it was the best bid; the best offer was at $1284.90.

62.     Less than one second later, at 8:26:48.474, with his 5-lot bid still pending, Flotron placed a 55-lot Spoof Order to sell December-delivery Gold Futures contracts at a price of $1285.10 that he intended to cancel before execution.

63.     At the time he placed this 55-lot Spoof Order to sell, it was two ticks from the best offer.

64.     At the time Flotron placed the 55-lot Spoof Order to sell, there was a total volume of 89 lots visible on the sell side of the Order Book and none of the five best offer levels contained a total volume of more than nine lots.  The visible volume on the buy side of the Order Book was 85 lots and none of the five best bid levels contained a total volume of more than nine lots.  Therefore, Flotron's 55-lot order turned an Order Book that had been relatively balanced into one in which there was over 60% more volume on the visible sell side of the book than on the visible buy side.  Moreover, the size of Flotron's offer was more than three times the total volume at any other visible price level.

65.     At 8:26:49.466, less than one second after he placed the 55-lot Spoof Order at $1285.10, Flotron's 5-lot buy order was filled at $1284.80.

66.     Following this fill, Flotron immediately—within a few tenths of a second—placed (either manually or through an automated trading tool he controlled) a series of three additional 5-lot Genuine Orders to buy and one additional 1-lot Genuine Order to buy that were filled at $1284.70 and $1284.80 in quick succession (within the next second).

67.     When the market started to move back up toward Flotron's 55-lot Spoof Order to sell, he cancelled it.  Specifically, at 8:26:52.720, the best bid went from $1284.60 (where it had been for about 1.5 seconds) to 1284.90, only two ticks from Flotron's 55-lot offer.  Flotron cancelled the 55-lot Spoof Order to sell in its entirety less than four-tenths of a second later.

68.     Flotron cancelled the 55-lot Spoof Order as it became more likely that it—or some portion of it—would get filled.

### 6. *October 17, 2013 Spoofing*

69.     On October 17, 2013, Flotron placed three disproportionately large Spoof Orders in a span of two and a half minutes, each of which he intended to cancel before execution.

70.     At 11:13:35.407, Flotron placed a 55-lot Spoof Order to sell December-delivery Gold Futures at $1319.40 that he intended to cancel before execution.  At the time it was placed, the best offer stood one tick away, at $1319.30.  The best bid was $1319.10.  By volume, the 55-lot sell order was equal to nearly 60% of the entire visible buy-side order volume.  It was also more than twice as large as the total volume at any other level in the visible Order Book.

71.     Approximately one-tenth of a second after placing the 55-lot Spoof Order to sell, Flotron placed a 1-lot Genuine Order to buy December-delivery Gold Futures at $1319.20, one tick higher than the previous best bid.  The genuine buy order was filled immediately.  About 10 seconds later, after getting filled on six more successive 1-lot bids at $1319.20, Flotron cancelled the 55-lot Spoof Order to sell in its entirety.

72.     At 11:13:55.778, Flotron placed another 1-lot Genuine Order to buy at $1319.20.  At the time of placement, it was the best bid in the market.  The best offer at the time was $1319.30.

73.     Despite being the best bid, the 1-lot order sat in the Order Book unfilled for over 4 seconds, at which point Flotron placed a 77-lot Spoof Order to sell at $1319.50 that he intended to cancel before execution.

74.     Just prior to placement of the 77-lot order, the total visible sell-side order volume was 119 lots and the total visible buy-side order volume was 93 lots.  The 77-lot Spoof Order, therefore, increased the total visible sell-side volume by over 60%.

15

75.    One millisecond after the placement of the 77-lot order, Flotron's 1-lot Genuine Order to buy was filled at $1319.20.

76.    Flotron (either manually or through an automated trading tool he controlled) subsequently placed six successive 1-lot Genuine Orders to buy at $1319.20, five of which were filled.  The sixth sat at the top of the Order Book for six seconds, at which point Flotron modified the price of his 77-lot Spoof Order from $1319.50 to $1319.40.

77.    Approximately 2.4 seconds after this downward modification, the sixth 1-lot buy order was filled.

78.    At 11:14:26.516, the market traded up to $1319.30, just one tick away from the 77-lot order that Flotron intended to cancel before execution.

79.    Flotron cancelled the 77-lot order in its entirety at 11:14:31.086.

80.    At 11:15:33.964, Flotron placed a 1-lot Genuine Order to buy at $1319.10.  At the time this order was placed, it was one tick away from the best bid.  The best offer was $1319.30.

81.    At 11:15:37.060, Flotron placed a 99-lot Spoof Order to sell at $1319.60 that he intended to cancel before execution.  At the time it was placed, the 99-lot order was four ticks away from the best offer.  At the time, the entire volume on the visible buy side of the Order Book was only 107 lots, the entire volume on the sell side was only 84 lots, and no single price level in the entire visible Order Book contained an order volume of greater than 17 lots.  Flotron's 99-lot Spoof Order more than doubled the volume on the sell side of the Order Book.

82.    No trades occurred in the market for the next four seconds.

83.    At 11:15:41.248, Flotron modified his 99-lot sell order down one tick, to $1319.50.  Less than one second later, Flotron's 1-lot Genuine Order to buy at $1319.10 was filled.  Flotron (either manually or through an automated tool he controlled) placed four

16

additional 1-lot Genuine Orders at $1319.10 in succession.  Three were filled immediately.  The fourth sat pending for four seconds, at which point Flotron modified his 99-lot order down one tick again to $1319.40.  Less than two seconds later, the fourth 1-lot buy order was filled at $1319.10.

84.     Again, Flotron placed four additional 1-lot Genuine Orders to buy at $1319.10, three of which were filled over approximately the next four seconds.  After the fourth 1-lot buy order had been pending for about three seconds, the volume on the buy side of the Order Book significantly increased.  Specifically, 60 lots were added to the buy-side volume in the course of a second.  The market price immediately went up to $1319.20, only two ticks away from Flotron's 99-lot Spoof Order that he did not want to be filled.

85.     Approximately one second after the price went up Flotron cancelled the 99-lot Spoof Order in its entirety.

## V.  VIOLATION OF THE COMMODITY EXCHANGE ACT

### COUNT I

**VIOLATIONS OF SECTION 4c(a)(5)(C) OF THE ACT, 7 U.S.C. § 6c(a)(5)(C)**
**(Disruptive Practices - Spoofing)**

86.     The allegations set forth in paragraphs 1 to 85 are re-alleged and incorporated herein by reference.

87.     By reason of the conduct described above, Flotron engaged in trading, practices, or conduct on or subject to the rules of a registered entity that is, is of the character of, or is commonly known to the trade as, "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution).

88.     In placing each Spoof Order, Flotron acted with the intent to cancel the bid or offer before execution.

17

89.     By reason of the foregoing, Flotron violated Section 4c(a)(5) of the Act, 7 U.S.C. § 6c(a)(5) (2012).

90.     Each Spoof Order, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of Section 4c(a)(5)(C) of the Act.

## COUNT II

### VIOLATIONS OF SECTION 6(c)(1) OF THE ACT, 7 U.S.C. § 9(1), AND REGULATION 180.1(a)(1) AND (3), 17 C.F.R. § 180.1(a)(1), (3) (Use of a Manipulative and Deceptive Device, Scheme, or Artifice)

91.     Paragraphs 1 to 85 are re-alleged and incorporated herein by reference.

92.     By reason of the conduct described above, Flotron, in connection with a contract for future delivery on a registered entity, intentionally or recklessly:  (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; or (2) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon market participants.

93.     Flotron acted intentionally or recklessly.

94.     By reason of the foregoing, Flotron violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017).

95.     Each Spoof Order and scheme, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1), (3).

## VI. RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, as amended, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.      An order finding that Flotron is liable for violating Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. § 6c(a)(5)(C), 9(1) (2012), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017);

B.      An order of permanent injunction restraining and enjoining Flotron, and any of his affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert with him who receive actual notice of such order by personal service or otherwise, from directly or indirectly violating Sections 4c(a)(5)(C) and 6(c)(1) of the Act and Regulation 180.1(a)(1) and (3);

C.      An order of permanent injunction restraining Flotron and any of his affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert with him from:

1.  Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

2.  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)) for his own personal account or for any account in which he has a direct or indirect interest;

3.  Having any commodity interests traded on his behalf;

4.  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5.  Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6.  Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and/or

7.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration or required to be registered with the

Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R.
§ 4.14(a)(9) (2017).

D.      An order directing Flotron to pay civil monetary penalties, to be assessed by the

Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C.

§ 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation

Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII,

Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2017), for each violation of the Act, as

described herein;

E.      An order providing for such other and further remedial and ancillary relief,

including, but not limited to, disgorgement, as this Court may deem necessary and appropriate;

F.      An order requiring Flotron to pay costs and fees, as permitted by 28 U.S.C.

§§ 1920 and 2412(a)(2) (2012); and

G.      An order providing such other and further relief as this Court may deem necessary

and appropriate under the circumstances.

## VII. JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated:  January 26, 2018                     Respectfully submitted by,


*/s/ John B. Hughes*                         */s/ Samuel Wasserman*
John B. Hughes (Local Counsel)               Samuel Wasserman
Assistant United States Attorney             Fed. Bar No. phv09401
Chief, Civil Division
157 Church Street                            David W. Oakland
New Haven, CT 06510                          Fed. Bar No. phv09423
Phone: (203) 821-3700
Fax: (203) 773-5373                          Patryk J. Chudy
Fed. Bar No. ct05289                         Fed. Bar No. phv03531
John.Hughes@usdoj.gov
                                             Manal M. Sultan, Deputy Director
                                             Fed. Bar No. phv09424

                                             Commodity Futures Trading Commission
                                             Division of Enforcement
                                             140 Broadway, 19th Floor
                                             New York, New York 10005
                                             Phone: (646) 746-9700
                                             Fax: (646) 746-9939
                                             swasserman@cftc.gov
                                             doakland@cftc.gov
                                             pchudy@cftc.gov
                                             msultan@cftc.gov